**ELI LILLY AND COMPANY and
Reliant Pharmaceuticals,
LLC, Plaintiffs,**

**v.**

**ZENITH GOLDLINE
PHARMACEUTICALS, INC.,
Defendant.**

**Cause No. IP99–0038–C–H/K.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 15, 2003.

Jan M. Carroll, Barnes & Thornburg, Indianapolis, IN, Ronald L. Grudziecki, R. Danny Huntington, Burns, Doane, Swecker & Mathis, Alexandria, VA, David A. Nelson, Latham & Watkins, Chicago, IL, for Plaintiffs.

Stephen E. Arthur, Harrison & Moberly, Indianapolis, IN, William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendant.

HAMILTON, District Judge.

### ENTRY ON FEE PETITION

This patent case is now before the court on plaintiff's petition for an award of attorney fees and costs under 35 U.S.C. § 285. As explained below, the court awards attorney fees of $1,523,580.85 and costs of $101,576.34.

United States Patent No. 4,375,547 claimed the invention of the drug nizatidine, which plaintiff Eli Lilly and Company has marketed as Axid®. Defendant Zenith Goldline Pharmaceuticals, Inc. infringed the '547 patent by filing an amended Abbreviated New Drug Application seeking FDA permission to manufacture and sell nizatidine before the patent expired. Zenith filed its amended application under the Drug Price Competition and Patent Term Restoration Act of 1984, better known as the Hatch–Waxman Act. Zenith's amended application included a "Paragraph IV" certification asserting that the

'547 patent was invalid as obvious from the prior art. See 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Plaintiff Lilly then filed this action for patent infringement, pursuant to 21 U.S.C. § 355(j)(5)(B)(iii).

After a trial to the court, the court found that the '547 patent was valid and infringed. In a patent case, the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The court also found that defendant Zenith's invalidity defense was so weak as to render the case "exceptional" within the meaning of 35 U.S.C. § 285, so that plaintiff Lilly should recover its reasonable attorney fees as well as its costs. *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 2001 WL 1397304 (S.D.Ind. Oct.29, 2001).

In *Hensley v. Eckerhart*, the Supreme Court expressed the hope that a "request for attorney's fees should not result in a second major litigation." 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). That hope has not been realized in this case. Lilly's request for fees and expenses exceeds $5 million. That sum is more than the amount in controversy on the merits in all but a small fraction of the cases on this court's docket. The parties have conducted discovery and submitted extensive submissions on paper. Neither party accepted the court's invitation to request a hearing, so the court has decided the matters on the paper record.

### I. *The Law Governing Attorney Fees Under Section 285*

█ Federal Circuit law governs the court's determination as to whether a case is "exceptional" under 35 U.S.C. § 285 so as to authorize an award of attorney fees and expenses, and the Federal Circuit has held that its law also applies to the calculation of fees and expenses under § 285. See *Special Devices, Inc. v. OEA, Inc.*, 269

F.3d 1340, 1343 (Fed.Cir.2001) ("the awarding of attorney fees pursuant to 35 U.S.C. § 285 is an issue unique to patent law and therefore subject to Federal Circuit law"); *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 182 F.3d 1356, 1359 (Fed.Cir.1999) ("Our precedent governs the substantive interpretation of 35 U.S.C. § 285, which is unique to patent law."). Accordingly, the court applies Federal Circuit law but also looks to Seventh Circuit law on points the Federal Circuit has not addressed.[1]

■ Section 285 authorizes "reasonable attorney fees." The standard method for determining a reasonable fee under § 285 is the "lodestar" method that federal courts also apply under a host of fee-shifting statutes. Under the lodestar method, the amount of attorney fees is determined by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. 1933. The court should then exclude from this initial fee calculation any hours that were not "reasonably expended on the litigation." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. As the Supreme Court cautioned:

> Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

*Id.* (emphasis in original). In applying these standards, the trial court may draw on its experience and judgment to eliminate unreasonable hours and charges from a fee request. See, *e.g.*, *Saxton v. Secretary of Dept. of Health and Human Services*, 3 F.3d 1517, 1521 (Fed.Cir.1993).

## II. *A Fee Award Is Warranted*

■ Notwithstanding the court's finding that this is an "exceptional case" under 35 U.S.C. § 285, Zenith contends at the outset that no fee award should be made in this case. The Federal Circuit has taught:

> Even an exceptional case does not require in all circumstances the award of attorney fees. Many factors could affect this result. The trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser.

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986) (vacating denial of fees to require explanation of decision); accord, *National Presto Industries, Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed.Cir.1996) (affirming denial of fees; trial judge has discretion "to weigh intangible as well as tangible factors: the degree of culpability of the infringer, the closeness of the question, litigation behavior, and any other factors whereby fee shifting may serve as an instrument of justice").

The court will not repeat here all of its detailed findings on Zenith's willful infringement and its lack of a reasonable foundation for believing the nizatidine pat-

---

**1.** Of course, all issues presented here are at bottom questions of federal law, regardless of circuit, and are subject to possible ultimate review by the Supreme Court.

ent was invalid. In summary, the case on the merits was not close. In light of the lack of a foundation for the invalidity defense and the financial incentives for Zenith if it won, it appears that Zenith was simply taking a calculated longshot gamble. If Zenith had won in court, its payoff would have been measured in the tens of millions of dollars. Before a party like Zenith forces a drug patent holder to defend its patent, at considerable expense, it is reasonable to expect the party filing the notice under the Hatch–Waxman Act to have something more solid than hope on its side. Awarding reasonable fees here should further the policies of the patent laws and the Hatch–Waxman Act by helping to discourage baseless claims of invalidity.

In finding willful infringement and an exceptional case under § 285, the court recognized, and recognizes now, the "concern that awards of increased damages and attorney fees not be allowed to thwart efforts to challenge the validity of patents believed in good faith to be invalid." *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1581 (Fed.Cir.1986). In this case, however, that concern is outweighed by Zenith's weak invalidity case and its groundless reliance upon an unreliable oral opinion from counsel. The prospect of a fee award under § 285 plays an important deterrent role under these circumstances.

■ Zenith's strongest argument for denying a fee award here is that Lilly submitted such an excessive and inflated petition for fees and costs that the court should simply deny it outright. As explained in detail below, the court agrees that Lilly's petition is extravagant and inflated. Case law supports a complete denial of such petitions, at least in extreme cases. See *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir.1980) (affirming denial of fee request for "an intolerably inflated" 800 hours where attorney merely filed

complaint and then filed motions for extensions of time to await outcome of pending, controlling Supreme Court case); see also *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 557 (5th Cir.1998) (affirming denial of fees where request was so "excessive it 'shock[s] the conscience of the court' "); *Fair Housing Council of Greater Washington v. Landow*, 999 F.2d 92, 98 (4th Cir.1993) (denying all fees where request was "outrageously excessive"); *Lewis v. Kendrick*, 944 F.2d 949, 958 (1st Cir.1991) (finding that unreasonably high fee demand in civil rights case forfeited all rights to a fee); *Sun Publishing Co. v. Mecklenburg News, Inc.*, 823 F.2d 818, 820 (4th Cir.1987) (affirming summary denial of fee petition so "exorbitant and unreasonable as to shock the conscience"); cf. *Lewis v. Kendrick*, 944 F.2d at 959 (Breyer, J., dissenting in part) (excessive fee request should allow but not require district court to deny fees in entirety).

The prospect of completely denying this excessive and unreasonable fee petition has considerable appeal in this case. Even the cases approving such complete denial of fee requests have acknowledged, however, that complete denial is an "extreme" response, *Scham*, 148 F.3d at 559, or "strong medicine," *Lewis*, 944 F.2d at 958, that should be used to discourage such unreasonable petitions. "If, as appellant argues, the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful." *Brown*, 612 F.2d at 1059; accord, *Lewis*, 944 F.2d at 958 ("A request for attorney's fees is required to be in good faith and in

reasonable compliance with judicial pronouncements, and not an opening gambit in negotiations to reach an ultimate result.").

A substantial disincentive is needed to discourage extravagant and inflated fee petitions. That disincentive need not be in all cases, however, a complete denial of the petition. See *Zabkowicz v. West Bend Co.*, 789 F.2d 540, 549–50 (7th Cir.1986) (reversing complete denial of fee as abuse of discretion, though petition was "undoubtedly excessive and unreasonable"). These questions are matters of degree. The policies underlying § 285 itself weigh in favor of a reasonable fee award in this case, and any reasonable fee in this case will still be substantial, in excess of $1 million. After considering the totality of the circumstances, including both the need to deter groundless filings under the Hatch–Waxman Act and the need to discourage such unreasonable fee petitions, the court chooses a course less extreme than complete denial. That course calls for approval of a reasonable amount of fees and costs rather than complete denial, but with the understanding that doubts about the reasonableness of a request will be resolved by denying or excluding the time or item from the award. In other words, in light of many of the specific excessive and even extravagant requests described below, the court has taken a skeptical approach to the entirety of Lilly's petition.

### III. *Barnes & Thornburg's Fees and Expenses*

Zenith, apart from its general argument that fees should not be awarded at all under § 285, has not objected to any of the time and charges submitted by Barnes & Thornburg, which is based in Indianapolis and served as local counsel for Lilly in this matter. The court will order Zenith to pay Lilly $12,900 for those fees and $1001.10 for expenses.

### IV. *Burns Doane's Fees and Expenses*

The vast majority of Lilly's fee petition is for work by lawyers and staff members of the law firm of Burns Doane Swecker & Mathis ("Burns Doane") of Alexandria, Virginia. The Lilly petition seeks a lodestar amount of $3,693,411.75 for fees for Burns Doane attorneys and staff members, using billing rates as high as $500 per hour. The Lilly petition also seeks about $196,000 in travel expenses for Burns Doane, photocopying expenses of $141,292.70, express courier expenses of $30,155.06, and overtime expenses of $15,287.50, among other expenses. Defendant Zenith contends that Lilly seeks reimbursement for unnecessary and extravagant expenses, for unreasonable hourly rates of Burns Doane lawyers and other staff members, and for unreasonable and unnecessary time spent on the case. The court agrees.

### A. *Selected Expenses of Burns Doane*

The Burns Doane portion of Lilly's petition includes requests for a number of extravagant, unnecessary, and improper costs. The fact that some of these costs were even requested reflects a lack of "billing judgment" and detracts substantially from any credibility to which the petition might otherwise be entitled. Some of the more extravagant and groundless requests include the following:

#### 1. *Trial "Security"*

■ Immediately before and during the trial, the Burns Doane trial team rented 21 hotel rooms in Indianapolis for about 14 days. In addition to the hotel expenses themselves (discussed below), Burns Doane and Lilly also hired a private security company to guard the rooms and their contents. The security company's charges were $16,659.00 (Exhibit P4, billing for 374.5 hours at $42 per hour, plus parking

expenses of no less than $58 per day, an unusually high charge in Indianapolis). Lilly seeks reimbursement of these expenses under § 285.

This request is unprecedented. Lilly has not identified any other case in American law shifting such a cost from the party who incurred it to the opposing party. In an attempt to justify this expense, Lilly wrote:

> In light of the sensitive nature of the information contained within the materials used by the litigation team, and the very real threat of industrial espionage, security agents were posted at the entrance to the litigation team's area.

Petition at 16. After Zenith challenged this expenditure, Lilly responded with more detail and an affidavit from inside counsel. Lilly explained that its "standard operating procedure" is to hire security at trials, and that Lilly does so to protect its own and other parties' confidential information. Lilly also pointed out that hotels are "notoriously public spaces." Reply at 37.

This request is groundless on several levels. First, the use of the hotel was caused only by Lilly's choice to use attorneys who would be on the road in the first place. As discussed below in Part IV-B, Lilly has not justified shifting to Zenith the costs resulting from that choice. Lilly could have used its own offices and/or those of a law firm in Indianapolis, which are close to the courthouse and presumably are reasonably secure without special "trial security" arrangements.

Second, as for the "very real threat of industrial espionage" that supposedly worried Lilly, this was not a case about cutting-edge technology of the 21st century. It was not even a case about trade secrets of the 21st century. This trial was about research done in the 1970s. The results of that research were published in a public document—the nizatidine patent. That patent was set to expire just seven months after the trial that supposedly called for this security. Moreover, the disputed issues revolved around even earlier published research done by others, and whether that research rendered obvious the 1979 discovery of nizatidine.

Third, it is worth asking just who was the subject of the security fears. Were Lilly and the Burns Doane lawyers seriously worried that the Zenith or its lawyers were going to burglarize their so-called "war room" in hopes of finding the magic document that would turn the tide in the case? [2]

Fourth, the bill for the security company itself actually understates the security expenses. The cost of the "security" hotel room was billed separately. The Burns Doane team's hotel bills also included meals for the security guards. After looking at the hotel bill, one can fairly wonder just how tight this unnecessary security actually was. The hotel bill for the "security room" was the single highest individual room bill, with charges for more than 140 long distance telephone calls, plus charges for laundry, movies and room ser-

---

**2.** Zenith and its lawyers had made reservations to stay in the same Indianapolis hotel that Lilly used. In perhaps the strangest aspect of this case, Zenith has submitted (hearsay) evidence to the effect that Lilly persuaded the hotel management to cancel Zenith's reservations about three weeks before trial. The hotel management advised Zenith's local counsel that the hotel's agreement with Lilly required that Zenith's lawyers be barred from the hotel, and that they even be barred from eating in its restaurants! See Kappes Aff. After this unusual variation on "Hoosier hospitality," Zenith's counsel made last-minute arrangements to stay at another hotel. This incident seems even more odd in light of Lilly's argument that a major reason it needed security was to protect the confidentiality of Zenith's own documents.

vice. In other words, Lilly's petition asks the court to order Zenith to pay for the unspecified movies that Lilly's private security guards watched in the hotel room while they were supposedly protecting 25 year old public technology from feared Zenith "industrial espionage."

If Lilly wanted to guard its documents from unknown threats, Lilly had the money to spend. But the expenses were not reasonable expenses that the losing party could fairly be required to pay.

### 2. Personal Charges

■ Even if one assumes that Zenith could fairly be charged the costs resulting from Lilly's decision to use lawyers who would be working on the road, with the resulting plane, hotel, and restaurant bills that approached $200,000 in total, Lilly and the Burns Doane team are still trying to bill Zenith for a host of personal expenses. These include unspecified movie charges, "entertainment service," laundry, and hotel bar and gift shop purchases that include a book and even newspapers. An attorney who was billing his time at $450 per hour was treating a 50–cent newspaper as an item that should be billed first to Lilly and then to Zenith! Even if Lilly was willing to pay for such expenses, they most certainly should not be shifted to the losing party under § 285. The fact that such expenses were even claimed shows a lack of "billing judgment" in the petition and further undermines its credibility.

### 3. First Class Airfare and Luxury Rental Cars

■ When the Burns Doane team traveled to Indianapolis or other cities, they often did so in style. The fee petition reflects several first class plane tickets, for trips on February 3, 2000, January 31 to February 2, 2001, May 24, 2001, and June 14–15, 2001. Some car rentals also reflect unusually high costs. For example, for a one-night trip to Indianapolis on July 26–

27, 2001 one Burns Doane attorney submitted a travel voucher with a charge of $321.24 for a rental car that had a daily rate of $103.99. Other car rentals specifically indicated "luxury" cars (May 4, 1999 and May 24, 2001), and others had daily rates of $89.99 and $78.99. Absent some unusual circumstances not identified by Lilly here, it is not reasonable to shift to the opposing party the costs of first class air travel, luxury cars, or even unreasonably high charges for less luxurious models. See *Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.*, 51 F.Supp.2d 302, 309 (S.D.N.Y.1999) ("An attorney and a client can make any arrangement vis-a-vis staffing of a case or the quality of the accoutrements furnished in the course of that service, but whether a court in law and equity can pass that along in toto to a losing adversary, that is what discretion is for."), *appeal dismissed by agreement*, 230 F.3d 1377 (Fed.Cir.2000). Again, in these respects, the petition reflects a lack of billing judgment that undermines its credibility.

### 4. Hotel Expenses

As noted, the Burns Doane trial team took 21 rooms in a downtown hotel for about 14 nights, running from August 31, 2001 to September 14, 2001. (A few rooms were for 13 nights and a few for 15.) The total hotel bill for the two weeks was $68,242.97. This total included relatively modest room charges ($92.00 per night) and lots of meals, banquet service, telephone calls, laundry, internet access, in-room movies, extra refrigerators, and furniture and office equipment for a "war room."

The sheer size of the trial team housed in the hotel was excessive. Three Burns Doane partners handled the speaking parts at a trial that had only seven witnesses. The hotel bill also included rooms

for three expert witnesses. The size of the support team of associates and legal assistants was unreasonable, as indicated by some of their billings. As Zenith notes, for example, one legal assistant who was part of the trial team billed 7.5 hours on September 1, 2001 for "assisting Gena Collins putting shelf together." He billed another 7.5 hours on September 2, 2001 for "assisting Jackie Bennett on going shopping for supplies for trial." Ex. J. His time for these tasks was billed to Lilly at $100 per hour. The same person worked an astonishing volume of hours. Beginning September 3rd, his daily billed hours were 13.5, 14.0, 14.0, 15.0, 18.0, 13.0, 13.0, an extraordinary 21.5 hours on September 10th, followed by 16.0, 16.0, 15.0, and 16.0, the last on September 14th. *Id.* Again, the petition reflects a lack of billing judgment. The court addresses the hotel expenses more directly, however, in terms of whether Lilly has sufficiently justified its decision to use attorneys who would be traveling for the trial and other events in this case, which Lilly itself chose to file in Indianapolis.

### 5. Secretarial Overtime

■ Burns Doane's charges also include $15,287.50 for secretarial overtime (reduced from a higher figure after Zenith asked for supporting documentation). The court sees no justification for shifting any of these costs from Lilly or Burns Doane to Zenith. A lawyer's rates are expected to include compensation for required administrative and secretarial help. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) This case did not require work on an emergency basis, which might justify overtime charges in unusual cases. These charges will not be allowed as an expense.

### B. Burns Doane's Hourly Rates

For time spent on the case in 2001, Lilly's fee petition requests Burns Doane

partner rates from $350 to $500, associate rates from $240 to $330, law clerk rates of $180 to $195, and legal assistant rates of $100 to $170. These rates are substantially higher than comparable rates for patent attorneys and their staffs in Indianapolis, Indiana, where this case was tried.

Lilly, of course, was free to make its own choice of counsel. Zenith argues, however, that it is not fair to require it to pay for the results of Lilly's choice—the substantially higher billing rates and resulting travel expenses—for litigating this case in Indianapolis.

The parties have not directed the court's attention to Federal Circuit decisions squarely on point under § 285 itself. In a number of decisions involving fee awards under other provisions of law, the Federal Circuit either has applied rates in the community where the trial was held, or has insisted on substantial justification for a decision to resort to higher-priced legal talent from other locations. See, *e.g., Raney v. Federal Bureau of Prisons*, 222 F.3d 927, 938 (Fed.Cir.2000) (*en banc*) (approving use of "community billing rate" for union's inside attorneys paid out of separate litigation fund); *Willis v. United States Postal Service*, 245 F.3d 1333, 1339 (Fed.Cir.2001) (applying regulation for fee awards that called for use of market rates in community where federal personnel hearing was held); *Gavette v. Office of Personnel Mgmt.*, 788 F.2d 753, 754 (Fed. Cir.1986) (allowing higher than normal rate under Equal Access to Justice Act where plaintiff showed a shortage of qualified local attorneys). In one of the key patent decisions under § 285, *Mathis v. Spears*, 857 F.2d 749, 755–56 (Fed.Cir. 1988), the Federal Circuit approved use of Los Angeles rates for a case tried in Los Angeles. The court is not aware of any Federal Circuit decision on a fee award authorizing reimbursement at rates higher

than prevailing local rates without at least a substantial showing of a need to obtain counsel elsewhere.

In the Seventh Circuit, the general presumption is that the relevant rates are those where the forum court is located. Higher rates for distant lawyers may be justified where a party has tried and failed to obtain qualified local counsel, or where there is other substantial reason to believe that services of equal quality were not available locally. See *Mathur v. Board of Trustees of Southern Illinois University*, 317 F.3d 738, 744 (7th Cir.2003) (reversing use of local rate because plaintiff showed he had made good faith effort to find local counsel who was willing and able to take on case and did not have conflict of interest); *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir.1982) (local rates should be used if there is reason to believe that services of equal quality were readily available at a lower charge or rate in local area, but if not, higher rates from attorney's home area may be used). Also, some distinctly "national" litigation, such as multi-district litigation under 28 U.S.C.

§ 1407, may justify the use of essentially "national" rates because the location of the forum court is fortuitous.[3]

District court decisions under § 285 generally take the Federal Circuit's and Seventh Circuit's approach under other laws, presuming that local rates apply, but recognizing that higher rates from other markets may be justified in some circumstances. *E.g.*, *SunTiger, Inc. v. Scientific Research Funding Group*, 9 F.Supp.2d 601, 608 (E.D.Va.1998) (applying rates from northern Virginia under § 285 and recognizing that patent law rates are "somewhat higher than those of general practitioners"), *aff'd mem.*, 194 F.3d 1335 (Fed.Cir.1999); *National Gypsum Co. v. Steel Systems Intern., Inc.*, 9 U.S.P.Q.2d 2073, 2075, 1988 WL 135780, *3 (D.Or. 1988) (allowing use of higher Chicago rates under § 285 for case tried in Oregon where prevailing party chose Chicago lawyer because he had been its patent counsel for many years and was familiar with its patent rights); *Howes v. Medical Components, Inc.*, 761 F.Supp. 1193, 1195–96

**3.** Other circuits apply the same general approach, presuming that rates in the forum's market should apply unless there is some showing of a need to bring in higher-priced expertise from other cities. These issues often arise in civil rights cases, which sometimes present challenges such as finding lawyers willing to bring unpopular cases against powerful defendants. See *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 955–56 (1st Cir.1984) (for fee award under 42 U.S.C. § 1988 in First Amendment case, local rates applied in absence of proof of entitlement to national rates); *Polk v. New York State Dep't of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983) (local forum rates apply unless party shows that special expertise from distant district was required); *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1187–88 (3d Cir.1995) (where few southern New Jersey firms were able and willing to take case, court affirmed fee award based on rates in entire state of New Jersey); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d

169, 179 (4th Cir.1994) (plaintiff overcame presumption in favor of local rates where local lawyers seemed unwilling to oppose governor and police in midst of miners' well-publicized strike); *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir.1997) (presumption in favor of local rates), abrogated on other grounds by *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001); *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140–41 (8th Cir. 1982) (applying local rates where there was no showing that local attorneys were not able and willing to handle the case); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir.1995) (affirming use of Salt Lake City rates rather than New York City rates in challenge to abortion laws; no showing that case was "so unusual or requires such special skills that only an out-of-state lawyer possesses"). To the extent there are differences among the circuits in the strength of the showing required, those differences would not affect the decision in this case.

(E.D.Pa.1990) (allowing New York rates under § 285 in Philadelphia case where local counsel had recommended the New York firm specializing in complex patent litigation, thus giving the client good reasons for turning to New York counsel with higher rates); *Water Technologies Corp. v. Calco Ltd.*, 709 F.Supp. 821, 824 (N.D.Ill. 1989) ("Chicago should be the basis for any comparison, since the litigation was here"); see also *Anglo–Danish Fibre Industries, Ltd. v. Columbian Rope Co.*, 2003 WL 223082, *2 (W.D.Tenn. Jan.28, 2003) (applying local rates rather than home market of plaintiff's counsel from North Carolina); *Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.*, 51 F.Supp.2d at 305 & n. 3 (applying New York rates for New York trial; rate under § 285 should be based on city where litigation took place, not counsel's business location); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 962 F.Supp. 357, 361 (E.D.N.Y.1997) (applying local New York rates under § 285, as opposed to lower rates in North Carolina, where the opposing party's counsel were located), following *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir.1997) ("well-established that the 'prevailing community' the district court should consider to determine the 'lodestar' figure is 'the district in which the court sits' "); *Thermovac Industries Corp. v. Virtis Co.*, 159 U.S.P.Q. 349, 354–55, 1968 WL 8409 (S.D.N.Y.1968) (holding that § 285 did not authorize payment of travel costs and other extra costs resulting from New York defendant's decision to use Chicago counsel in case in New York).

When a fee award is based on higher rates from distant markets, the award is often based on the theory is that the higher rates reflect a specialist's expertise that should reduce the overall costs of the representation. Judge Barker took that approach, for example, in *American Booksellers Ass'n, Inc. v. Hudnut*, 650 F.Supp. 324, 328 (S.D.Ind.1986) (approving fee award in First Amendment case using New York rates: "while the billing rates of specialists from large cities may be higher, the expertise of the specialist may actually reduce the number of hours that would normally be necessary to gain a mastery of the particular area of the law").

The same point is well-illustrated by a trademark case, *Playboy Enterprises, Inc. v. P.K. Sorren Export Co.*, 221 U.S.P.Q. 124, 125, 1983 WL 178 (S.D.Fla.1983). There the court allowed all reasonable travel costs for a New York lawyer litigating a case in Florida. The prevailing party had chosen a law firm that had represented it in prior trademark actions. Also, there was no reason to believe the party would be involved in future trademark litigation in Florida. Most important, the court was satisfied that the New York lawyer's familiarity with the client and its trademark rights was sufficient to offset the travel time and expense.

■ This theory of greater expertise leading to greater overall efficiency has no application at all to this case. As explained in detail in this entry, Burns Doane's handling of the case is replete with excessive hours, overstaffing, excessive conferences, a failure to exercise billing judgment, and excessive, even extravagant expenses.

To support its use of Burns Doane, Lilly submitted with its reply brief an affidavit from its deputy general patent counsel. The affidavit states that Lilly selected Burns Doane as lead counsel "in part due to the longstanding relationship between Lilly and Burns, Doane." Ex. JJ ¶ 2. The affidavit does not assert that the Burns Doane attorneys had any special familiarity with the nizatidine patent at issue here. The affidavit also does not indicate that Lilly had even considered, let alone tried to find, counsel closer to the forum court to handle the case at lower rates.

On this record, therefore, including the record of overstaffing and excessive hours and expenses, as well as the fact that Lilly itself chose the forum, the reasons that might justify a fee award based on higher rates from other markets do not apply. The presumption in favor of applying rates in the forum community applies.

Patent litigation is of course a specialized area of practice that typically commands rates higher than most areas of practice. *SunTiger, Inc. v. Scientific Research Funding Group,* 9 F.Supp.2d at 608. The Federal Circuit has approved use of the American Intellectual Property Law Association's economic survey in awarding fees under § 285. *Mathis v. Spears,* 857 F.2d 749, 755–56 (Fed.Cir. 1988) (finding that district court properly considered surveys in deciding on reasonable rates); see also *View Engineering, Inc. v. Robotic Vision Systems, Inc.,* 208 F.3d 981, 987 (Fed.Cir.2000) (approving use of AIPLA survey to reduce hourly rates sought as Rule 11 sanctions in patent case). Both sides in this case have urged consideration of AIPLA surveys, though they advocate consideration of different markets.

■■■■ The court applies the rates for "Other Central" (*i.e.,* other than Chicago and Minneapolis). Also, the court applies the rates for the 75th percentile for 2001. Those rates are $250 per hour for partners and $180 per hour for associates. Def. Ex. H. The court is using the 75th percentile because this case was relatively challenging, calling for substantial expertise. The AIPLA survey does not include rates for law clerks and legal assistants, but using the approximate ratio of Burns Doane actual associate rates to those for its law clerks and legal assistants, the court will apply a rate of $100 per hour to all such personnel. The court applies the rates for 2001 to all Burns Doane hours in the case to compensate for the delay in payment for

earlier years. A court may elect to use either current rates or past rates with interest as acceptable compensation for the delay in payment of fees. *Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (adjustment justified under 42 U.S.C. § 1988); *Smith v. Village of Maywood,* 17 F.3d 219, 221 (7th Cir.1994). (As explained below in Part VIII, however, the court is denying any additional prejudgment interest, including adjustments for the fact that the fee petition has taken so long to resolve. In the court's view, that delay resulted primarily from Lilly's and Burns Doane's failure to exercise billing judgment in submitting an inflated and extravagant petition for fees and expenses, which required Zenith and the court to undertake much more work than should have been necessary on this petition.)

### C. *Hours Expended by Burns Doane*

Lilly's "lodestar" figure for Burns Doane is based on a total of 5,108.75 partner hours, 4,214.00 associate hours, and 4,971.73 law clerk and legal assistant hours. The following discussions of challenges to the lodestar amount work from those figures as starting points. Using Burns Doane's then-current rates, those hours add up to approximately $3.7 million. Zenith spent about $1.2 million in fees defending the case.

Both figures are substantial, of course, but to keep the fees in reasonable perspective, one must bear in mind the nature of and stakes in the case. The case was factually challenging. The contested issues on the merits were issues of medical chemistry—the study of the biological effects of many related compounds—requiring familiarity with organic chemistry, medicine, and pharmacology, as well as patent law and litigation. The stakes were large. For Lilly, Zenith's challenge to the

nizatidine patent, U.S. Patent No. 4,375,-547, threatened the early loss of exclusive rights to market a drug that was generating annual revenues of about $200 million. Even by the time of trial, when only seven months remained on the life of the patent, the stakes for Lilly were still considerable. The same was true for Zenith. If defendant Zenith had succeeded in having Lilly's nizatidine patent invalidated, Zenith could have benefitted to the tune of tens of millions of dollars by gaining the 180–day "head start" among generic competitors offered as an incentive under the Hatch–Waxman Act. See 21 U.S.C. § 355(j)(5)(B)(iv).

At the same time, the case was more streamlined than many high-stakes patent cases. The case involved only one patent with one claim, which presented no issue of claim interpretation. Plaintiff's ownership of the patent and defendant's infringement of the patent were both stipulated. The case involved only one issue on the merits—Zenith's defense of invalidity for obviousness. The case did not present any question of damages, so there was no need for expensive discovery on such matters. The case was tried to the court, which should have limited the need for some of the expensive computerized and video glitz in evidentiary displays that often characterize modern patent jury trials. There was no need for the parties to prepare for jury selection or to draft jury instructions. The court also did not invite or welcome proposed findings of fact and conclusions of law. Further, as a result of cooperation by counsel and the court's decision to exclude evidence regarding the manner in which plaintiff invented nizatidine, see 35 U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was made."), the case was tried in four days with seven live witnesses and a few deposition excerpts.

The benefits of this last bit of streamlining came relatively late in the case, however, at the time of the final pretrial conference when the court ruled on a Lilly motion *in limine*. Zenith had pursued discovery from Lilly about the way Lilly scientists invented nizatidine. Lilly had to respond to that discovery and had to be ready to try the factual issues concerning its manner of discovery.

Zenith took some other steps that added considerably to Lilly's burden in defending the validity of the nizatidine patent. The notice letter that Zenith submitted under the Hatch–Waxman Act asserting that the nizatidine patent was invalid was utterly conclusory. It provided no explanation or theory. Instead, Lilly had to use formal discovery methods to draw out Zenith's theory, which Zenith was slow and reluctant to articulate. The delayed disclosure of that theory of obviousness was not justified—indeed, it was symptomatic of Zenith's problems on the merits—and added to Lilly's expenses.

Zenith has identified a number of specific areas in which it contends that Burns Doane billed excessive hours to a particular task. Before addressing those specific issues, the court must address a methodological problem. The Burns Doane time entries, as is common, show each time-keeper's time on the entire case for each day as one entry, without assigning times to particular tasks.[4] Zenith's calculations assume that, where it has objected to one task recorded during the day, all of the lawyer's time for the day was spent on that task. That approach overestimates the objectionable time. The court has reviewed the time entries in question and has made its own estimates based on the court's judgment and experience. In the absence of clearer guidance regarding a specific task or issue, the court has gener-

---

**4.** Zenith's lawyers' time entries often speci- fied amounts for specific tasks during the day.

ally estimated that half the daily entry was devoted to the task in question. The court believes this is a more reasonable approach, but one that does not leave the Burns Doane bills immune from review.

### 1. *Preparing and Filing the Complaint*

■ Zenith challenges the reasonableness of hours at the very outset of the case. One Burns Doane partner spent roughly 19.5 hours (allowing for combined time entries) drafting and revising the complaint, and another partner spent 1.25 hours reviewing and revising the draft. These hours do not include many hours billed to analysis and legal research at the beginning of the case. For a four-page complaint, the hours charged were unreasonable. The court subtracts 10.0 partner hours from the lodestar amount.

■ Zenith also points out that several Burns Doane lawyers devoted an unspecified number of hours to issues of venue and personal jurisdiction before finally settling on filing the action a mile from Lilly's corporate headquarters. The court agrees with Zenith that the devotion of time to this task was unreasonable under the circumstances. The court subtracts an additional 10.0 partner hours from the lodestar amount on this basis.

### 2. *Minor and Uncontested Pleading Revisions*

■ Zenith's original notice under the Hatch–Waxman Act stated that Zenith was seeking approval to market only the 300 mg size of nizatidine capsules. After Lilly filed its complaint, Zenith sent a supplemental notice seeking approval to market both the 150 mg and 300 mg sizes. Burns Doane lawyers then prepared an amended complaint with accompanying motion to ensure that the complaint covered both sizes. Also, Zenith's answer stated that Zenith did not infringe any claim of the nizatidine patent that was both valid and enforceable. Burns Doane lawyers responded with a motion to strike and to dismiss or in the alternative for a more definite statement. Zenith responded to the motion by filing an amended answer that deleted the offending language. The court then denied Lilly's motion as moot.

Burns Doane partners spent more than 70 hours on these matters. One associate spent 86.5 hours on them. Neither matter involved any opposition at all from Zenith. As Zenith points out, a telephone call to opposing counsel would have spared a great deal of this expense. The court assumes that these matters required some consideration, even by attorneys as expert in the subject area as the Burns Doane lawyers. But these were not reasonable expenditures of time at the time they were made. The court subtracts 50 partner hours and 75 associate hours from the lodestar amounts.

### 3. *Scouting the Presiding Judge*

■ One Burns Doane partner billed an estimated four hours in January and February 1999 gathering and reviewing "background" information on the presiding judge in the case. An information specialist also devoted several hours to the effort. The effort is mildly amusing, especially since there is no indication that the Burns Doane lawyers asked their local counsel for information on the topic, as Zenith's lawyers apparently did (based on their time records for January 1999). The court subtracts 4.0 Burns Doane partner hours from the lodestar total. See *Revlon, Inc. v. Carson Products Co.*, 622 F.Supp. 362, 364 (S.D.N.Y.1985) ("well-settled that 'reasonable' attorney fees do not include ... reading prior unrelated decisions by the trial judge"), *rev'd on other grounds*, 803 F.2d 676 (Fed.Cir.1986); *Thermovac In-*

*dustries Corp. v. Virtis Co.,* 159 U.S.P.Q. 349, 354–55 (S.D.N.Y.1968) (under § 285, disallowing hours spent reading judge's unrelated decisions and watching judge in court in other cases).

### 4. *Case Management Plan*

■ The same Burns Doane partner also spent about 14.0 hours (the court's estimate from the combined time entries) preparing and discussing the original case management plan in the case. Zenith argues that the amount of time is excessive, and the court agrees. See *Martin v. City of Indianapolis,* 28 F.Supp.2d 1098, 1105 (S.D.Ind.1998) (finding 11 hours excessive for that task, and allowing 3 hours in fee award), *aff'd,* 192 F.3d 608, 614 (7th Cir. 1999). This case was a little more complex, so the court allows 4.0 hours for the task and subtracts 10.0 partner hours from the lodestar hours.

### 5. *Drafting Discovery Requests*

■ Zenith contends that the same partner also billed 37 hours for preparing some routine interrogatories and document requests. A more realistic estimate (because of combined time entries) is about 20 hours. That amount is still excessive for the task, especially for a lawyer with the partner's experience and billing rate. The court allows 10.0 hours for the task and subtracts 10.0 partner hours from the lodestar hours.

### 6. *One Partner's "Analysis"*

■ The same Burns Doane partner billed about 121 hours in March and April 2000 devoted to unspecified "case analysis" or "case summary." Zenith argues that the time was not well-spent because there is no indication that it actually furthered progress on the lawsuit. This item is one of those areas where it is difficult to know what happened and how reasonable the effort was. Lawyers obviously need to spend some time thinking about their cases, even if the work is not immediately incorporated into a document filed with the court or sent to the opposing side. At the same time, the potential for unreasonable and excessive time devoted to such unspecified efforts is obvious. Because the overall fee petition is so excessive, Lilly and Burns Doane have forfeited credibility on these matters. The court subtracts 60 partner hours from the lodestar total.

### 7. *Joint Motion to Amend Case Management Plan*

■ The same Burns Doane partner spent an estimated (because of combined time entries) 21.5 hours in February and March 2000 on a joint motion to amend the case management plan. Without some further explanation, which has not been offered, this time was plainly excessive for the task. The court subtracts 16.5 partner hours from the lodestar total. See *Martin v. City of Indianapolis,* 28 F.Supp.2d at 1105 (allowing total of three hours to prepare original case management plan).

### 8. *Preparing a Witness Who Died Without Testifying*

■ The inventor of nizatidine was Dr. Richard Pioch. Zenith sought and obtained extensive discovery concerning Dr. Pioch's research that resulted in nizatidine. Zenith then sought to present evidence at trial concerning how Dr. Pioch invented nizatidine. Just before trial, however, the court granted Lilly's motion *in limine* to exclude evidence regarding how the patented invention was made. See 35 U.S.C. § 103(a).

During discovery, Zenith sought Dr. Pioch's deposition. By the time this suit was filed, Dr. Pioch was elderly and in poor health. He died before the deposition could be taken. Zenith has objected to Burns Doane attorneys' time devoted to preparing Dr. Pioch for the deposition that

never occurred. However, in light of Zenith's efforts to obtain discovery regarding these matters, and without the benefit of hindsight, it was reasonable for Lilly's lawyers to invest a substantial amount of time preparing the ill Dr. Pioch for a deposition in this case.

How much time was reasonable? Dr. Pioch was the principal investigator on a major research project that began more than 25 years before the discovery was sought. He had not been involved in the project for 15 years, and he had been retired for 14 years. Any experienced lawyer can easily imagine the difficulties and risks that such a deposition might pose, especially while Zenith was still trying to show invalidity by focusing on how Dr. Pioch and his team invented nizatidine. The challenges in preparing such a witness adequately to testify about such complex events from many years earlier are self-evident. The court makes no specific deduction on this item, but will account for the likely overbilling and overstaffing through a broader cut of the lodestar hours that remain after the other specific challenges are resolved. See, e.g., *Yamanouchi Pharmaceutical*, 51 F.Supp.2d at 309 (imposing 30 percent reduction to requested attorney fees to account for various excessive charges), citing *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983) (authorizing such "a practical means of trimming fat" where voluminous fee applications make it unrealistic to expect district courts to rule on every time entry).

### 9. *Lilly's Opposition to Motion to Compel*

■ In August 2000, Zenith filed a motion to compel Lilly to provide more specific discovery responses. In particular, Zenith complained that Lilly should not be permitted to use Fed.R.Civ.P. 33(d) to answer interrogatories by directing Zenith to some 47,000 pages of 20-year-old research

files because the burden of deriving the requested information would be substantially the same for each side. One Burns Doane associate billed an estimated 28 hours to the 11-page opposition to the motion. A Burns Doane partner then billed an estimated 16 hours to the opposition. The court granted the motion in part and denied the motion in part. In light of the mixed results, the court denied fees to both parties under Fed.R.Civ.P. 37(a)(4). The court views the amount of time spent on the motion as excessive. Also, it would be unfair to require Zenith to pay for the unsuccessful portion of Lilly's opposition to the motion. The court subtracts 14.0 associate hours and 8.0 partner hours from the lodestar hours.

### 10. *Lilly's Unfiled Motion for Summary Judgment*

■ In 2000, Lilly lawyers spent a substantial amount of time preparing a motion for summary judgment that was never filed. Lilly blames this abortive effort on Zenith's "dilatory and obfuscatory practices." Lilly even goes so far as to argue that the court "should encourage [such] efforts to expedite resolution of matters before it, and should fully compensate Lilly for those efforts here." Lilly Reply Br. at 22.

The court is aware of Zenith's long delay in explaining its theory of invalidity. Zenith's difficulties in explaining that theory played a role, of course, in the court's decision on the merits and the determination that this is an "exceptional" case under § 285.

Nevertheless, spending hundreds of lawyer hours on a motion for summary judgment for which the essential foundation was not yet available, and which was never filed, is not and was not a reasonable expenditure of time. This is not merely a judgment based on hindsight. This effort

was not a reasonable expenditure of time back when the work was done. Lilly's suggestion that the court should *encourage* such efforts is preposterous. The suggestion emphasizes just how far removed from reason this fee petition is, and further illustrates why this petition lacks credibility.

This time is disallowed in its entirety. Zenith estimates that the effort took 265 partner hours and 75 associate hours. See Zenith Br. at 19. Lilly does not dispute those figures, and the problem of combined time entries appears to be minimal for this project. The court subtracts 265 partner hours and 75 associate hours from the lodestar hours.[5]

### 11. *Lilly's Unsuccessful Motion to Compel*

■■■ Lilly moved to compel Zenith to produce opinions of counsel prepared after the Federal Circuit decided *Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339 (Fed.Cir.2000), a similar case involving an obviousness challenge to a patent on a drug closely related to nizatidine. In connection with the briefing, Zenith filed its own motion for a protective order. The court denied Lilly's motion to compel and granted Zenith's motion for a protective order. *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 149 F.Supp.2d 659, 661 (S.D.Ind. 2001). The court found that the act of infringement had occurred long before the Federal Circuit's decision in *Yamanouchi*, so that later opinions of counsel would not shed relevant light on Zenith's decision to infringe.

Lilly seeks full reimbursement for this completely unsuccessful effort. As Lilly points out, most successful lawsuits have some dead ends and unsuccessful elements, and reasonable efforts in those directions can be compensable in a fee award. See *Bohen v. East Chicago*, 666 F.Supp. 154, 158 (N.D.Ind.1987) (Easterbrook, J., sitting by designation). Awarding fees for the unsuccessful motion to compel, however, as Lilly asks, would turn upside down the fee-shifting provisions of Rule 37(a)(4) of the Federal Rules of Civil Procedure. Rule 37(a)(4) establishes a presumption in favor of a fee award for the party who prevails on the motion itself. (The court has discretion to depart from that presumption, of course, and the court did so on this discovery motion because the issues were novel and rather close.) Lilly is arguing that Zenith, which won the motion, should pay Lilly for its efforts in filing the unsuccessful motion. Time on this effort is excluded from the fee award. Zenith estimates that Burns Doane lawyers spent a total of 161 hours on the effort. Lilly has not disputed that number. The court subtracts 111 partner hours and 50 associate hours from the lodestar. (Before trial, Burns Doane partners spent two or three hours on the case for every associate hour.)

---

**5.** Zenith also criticizes Lilly for having a high ratio of partner to associate hours on the project and on the case more generally. Zenith points out correctly that Lilly and other plaintiffs argued to this court in another case that such ratios were inefficient. This court, however, rejected Lilly's argument in the other case. The court wrote that the criticism "reflects a persistent but not always accurate caricature of law practice" that "tends to undervalue legal research and writing." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 2002 WL 1801647, *6 (S.D.Ind. July 5, 2002); see also *Copeland v. Marshall*, 641 F.2d 880, 903 n. 50 (D.C.Cir.1980) (*en banc*) (agreeing with district court that not enough partner time had been spent in the case overseeing efforts of less experienced lawyers). The court is not criticizing Lilly for its ratio of partner hours to associate hours, but for undertaking a project that was unreasonable at the time, and more generally for spending excessive amounts of hours overall.

#### 12. *Attorney Time for Drafting Expert Reports*

██ Zenith estimates that Burns Doane lawyers spent 175 hours helping Harry Manbeck prepare his expert witness report, and that Burns Doane lawyers spent 100 hours in one week helping Dr. Taylor prepare his rebuttal report. Lilly has not disputed these figures, and the court agrees with Zenith that they reflect plainly excessive time billed for these tasks. Surely a full 40–hour week of lawyer time for each witness should have been more than enough to help expert witnesses of their caliber. Based on this challenge, the court subtracts 150 partner hours and 45 associate hours from the lodestar amount.

#### 13. *Double and Triple–Teamed Depositions*

██ Burns Doane lawyers double-teamed many depositions and triple-teamed some of the most important ones. (This count does not include legal assistants or Lilly's in-house attorneys.) In a case of this complexity and these stakes, double-teaming a deposition is not unreasonable or unusual. Zenith's lawyers often double-teamed depositions, as well. The court draws the line at triple-teaming, though. Nor is it clear why legal assistants were reasonably included in a team that already included two Burns Doane attorneys, often two partners. The parties' materials do not enable the court to make a single estimate of the excessive time, but some adjustment is needed. The court will account for this excessive billing as part of an overall deduction, discussed below.

#### 14. *Lilly's Unfiled Proposed Findings and Conclusions*

██ Lilly's lawyers spent about 286 lawyer hours in the summer of 2001 preparing proposed findings of fact and conclusions of law prior to trial. The court did not request the parties to submit such proposed findings and conclusions. In the court's experience, such efforts are usually duplicative and wasteful in all but the most routine cases, and the products are often so slanted that they save the court little time in preparing its own findings and conclusions.

Zenith argues that it was unreasonable for Lilly's lawyers to spend so much time and money preparing the proposed findings and conclusions without some indication from the court that they would be welcome. Lilly argues that it was reasonable for it to prepare the document because many courts invite the parties to file such proposed findings and because the task helped Lilly define exactly what it did and did not need to prove. Lilly does not disagree with the estimate of 286 lawyer hours.

The court agrees with Zenith that the effort was not reasonable in this case. After spending all the other time they had already spent on the case (recall, for example, all the "analysis" hours noted above), Lilly's lawyers surely knew long before trial what they did and did not need to prove. As compared to the expenditure of roughly $50,000 to $60,000 in lawyer time to prepare a document the court did not need or want, the cost of a telephone call to the court's courtroom deputy clerk to inquire about the matter would have been a modest and reasonable investment. The court subtracts 214 partner hours and 72 associate hours from the lodestar.[6]

---

**6.** Even if it had been reasonable for the Burns Doane lawyers to prepare the document, the sheer number of hours devoted to the project was much more than any reasonable number. This project provides further evidence of the overstaffing and excessive time devoted to the case by Burns Doane lawyers.

### 15. *Lilly's "Hopeless" Summary Judgment Motion*

Just two months before trial, on July 11, 2001, Lilly filed a motion for partial summary judgment seeking to have the court reject Zenith's invalidity defense as a matter of law. Zenith estimates the project took 368 hours, and Lilly has not disputed the estimate. For two reasons, the motion was not a reasonable expenditure of attorney time and effort.

First, on the merits, in light of the conflicting expert opinions being offered on the merits of the case, Lilly's motion did not have a chance. The standard for granting summary judgment is simply too high.

Second, as a matter of timing, the court was not going to delay the trial because of such a late-filed motion for summary judgment. (Under this court's plan adopted pursuant to the Civil Justice Reform Act of 1990, the court should ordinarily continue a trial when a dispositive motion is pending 30 days before trial. Lilly's motion was not even fully briefed 30 days before trial.) Under the Hatch–Waxman Act, the court has an obligation to address the case promptly. See 21 U.S.C. § 355(j)(5)(B)(iii) (allowing 30 months to complete litigation unless court finds that either party "failed to reasonably cooperate in expediting the action"). When Lilly filed its motion for summary judgment, the court had already continued the trial over Zenith's objections because Zenith had failed to meet its deadlines for expert witness disclosures. *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.,* 58 U.S.P.Q.2d 1543, 2001 WL 238090, *1 (S.D.Ind. March 8, 2001). Further delay of the trial also would have worked to

Lilly's benefit. In fact, a delay until the nizatidine patent expired (in April 2002) would have effectively given Lilly a victory on the merits of the suit. In light of this incentive for delay, the late motion for summary judgment appears to have been primarily an effort to run out the clock on Zenith.[7]

Lilly argues that it is entitled to the time it spent on unsuccessful efforts that were part of its larger and successful effort on the merits of the case, citing *Hensley v. Eckerhart,* 461 U.S. at 434–37, 103 S.Ct. 1933; see also *Bohen v. East Chicago,* 666 F.Supp. at 158 (awarding fees for attorney time working with one expert witness who was not called and for discussing case with other experts; "Blind alleys are an ordinary part of litigation, as are standby witnesses.").

Lilly's point is valid in the abstract, but it does not apply here. As Judge Easterbrook also pointed out in *Bohen,* the retrospective view on the outcome of the effort is the wrong view. The question is whether it was reasonable *at the time* for the prevailing party's lawyers to make the effort. *Id.* From that perspective, it was not reasonable for Lilly's lawyers to invest 368 hours in a virtually certain loser of a summary judgment motion, especially when the motion looked most like an elaborate effort to force a further delay in the trial and thus to postpone the possible day of reckoning for the nizatidine patent. At the time the work was done, Lilly's lawyers should have realized that it would not be reasonable to invest attorney time to prepare such a motion.

Lilly also argues that the effort was not a complete waste because the court said it

---

**7.** Lilly filed its motion on the last day allowed by a revised case management plan that the parties negotiated, so the motion was not filed after an applicable deadline. In view of the time pressures created by the Hatch–Waxman Act and the prior delay of the trial, however, only the most compelling showing of grounds for summary judgment could have persuaded the court to delay the trial again.

would treat the summary judgment papers as the practical equivalent of trial briefs on the issue of validity. True, the court did try to squeeze a few drops out of this very expensive lemon to make a little lemonade. The court tried to prevent the hopeless effort from being a *complete* waste of time and money, but that treatment does not show that the motion was a reasonable expenditure of attorney time that would be fair to shift to Zenith under § 285.

Perhaps the best reason Lilly has offered for the motion is that it required Zenith finally to articulate in detail its theory of obviousness. Lilly had already obtained that information, however, or should have obtained that information, from Zenith's expert reports and depositions. At the very least, a full-scale motion for summary judgment was an extraordinarily expensive and unreasonable way to obtain such a statement. The court subtracts 276 partner hours and 92 associate hours from the lodestar amount.

### 16. *Preparation of Witnesses Not Allowed to Testify*

Zenith claims that Lilly's petition seeks 140 lawyer hours for preparing Scott Rose and Peter Stringer to testify. At trial, the court determined that most of their intended testimony would not be admissible. Rose testified, though, about the commercial success of Axid®, the Lilly product embodying nizatidine. His testimony was relevant to the issue of obviousness.

On this challenge, Zenith's methodology has led it to overestimate by a wide margin the time actually spent on this task. The entries Zenith has added up came just before and during trial itself. Yet Zenith has assumed that all of one Burns Doane attorney's time entries for several of these days (several of which were for 15 hours or so) were spent preparing Rose and Stringer. The court rejects this challenge entirely. At the relevant times, that attorney was far too busy with other tasks to spend excessive time on these minor witnesses. The court makes no reduction on this basis.

### 17. *"Trial Preparation," Trial Work, Conferences and Discussions, and Travel Time*

■ Zenith also criticizes Burns Doane for (a) substantial amounts of attorney time recorded only as unspecified "trial preparation" or similarly opaque descriptions; (b) excessive trial work in which 26 timekeepers billed $1.2 million in six weeks of final trial preparations and trial; (c) excessive discussions and conferences; (d) and travel time incurred because of Lilly's decision to use a Washington-area law firm as lead counsel. The court treats all of these challenges together, along with the excessive staffing of depositions discussed above.

After examining the time records, the court agrees that the Burns Doane records contain excessive trial preparation, an excessively large trial team, and an unusually high volume of time billed to internal staff conferences. The travel time was also substantial, as was the time billed in October 2001 to preparing the fee petition, which is disallowed for reasons discussed below in Part VIII. Also, the Burns Doane track record on billing, as shown by the more specific discussions above, leaves the court confident that all the billing was excessive to a substantial degree. The bills show a lack of the "billing judgment" the Supreme Court has expected at least since *Hensley v. Eckerhart*, 461 U.S. at 434, 103 S.Ct. 1933. Nevertheless, as compared to most of the specific challenges discussed above, it is difficult to quantify the excess amounts in these categories of time, just as it is difficult to quantify "waste" in a government agency's budget.

(Few budgets include "waste" as a line item.)

In such circumstances, especially with such a large fee request, and with many specific demonstrations of unreasonable and excessive portions of the fee request, the court can apply a rough estimate to the remaining hours in question and can make a reasonable deduction on a percentage basis. See *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983) (affirming cuts ranging from five to twenty percent of hours per lawyer: "In similar cases with voluminous fee applications, courts have recognized that it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application."); accord, *Coulter v. State of Tennessee,* 805 F.2d 146, 152 (6th Cir.1986) (affirming 50 percent reduction for duplication of effort that was difficult to measure); *Ohio–Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646, 657 (7th Cir.1985) (affirming 15 percent reduction for inadequately documented hours); *Copeland v. Marshall,* 641 F.2d 880, 903 (D.C.Cir.1980) (*en banc*) (affirming 22 percent cut); *Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.,* 51 F.Supp.2d 302, 309 (S.D.N.Y.1999) (courts may reduce lodestar by a percentage cut "as a practical means of trimming fat from a fee application"), quoting *Carey, supra,* appeal dismissed by agreement, 230 F.3d 1377 (Fed.Cir.2000); *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 962 F.Supp. 357, 361–62 (E.D.N.Y.1997) (25 percent cut for excessive hours; for example, seven timekeepers traveled to Washington for appeal, and other excessive billing was identified); see also *Lynch v. Milwaukee,* 747 F.2d 423, 430 n. 7 (7th Cir.1984) (citing *Copeland v. Marshall* with approval regarding use of percentage cut when practical).

At the same time, the court must take care to examine the issues and may not, as the Seventh Circuit has said, simply "eyeball" a request and reduce it by an arbitrary percentage because it seems excessive to the court. *E.g., People Who Care v. Rockford Board of Education,* 90 F.3d 1307, 1314 (7th Cir.1996) (district court erred by deducting hours on theory that plaintiff's lawyer could not have billed 42.5 hours per week, when opposing counsel in the case billed that many or more); *Heiar v. Crawford County,* 746 F.2d 1190, 1204 (7th Cir.1984) (district court erred by cutting $50,000 fee request in half without at least a concise explanation of reasons).

In this case, the court has addressed above in detail a number of specific projects and tasks that either should not have been carried out and billed at all, or to which an unreasonable number of hours were devoted. The result of those deductions is to reduce the lodestar partner hours from 5,108.75 to 3,914.25, and the lodestar associate hours from 4,214.00 to 3,791.00. The court has also explained how the excessive claims for reimbursement of expenses and the hours have essentially forfeited any benefit of a doubt the fee petition might otherwise have deserved. In light of all these circumstances, the court subtracts another 30 percent of the partner and associate hours as a rough measure for addressing the excessive trial preparation, the unduly large trial team, the excessive internal conferences, the overstaffing of depositions, the unnecessary travel time, and the time already billed to preparing the fee petition.

After making those 30 percent reductions, the revised lodestar amount of partner hours is 2,739.975 and the lodestar amount of associate hours is 2,653.70. Multiplied by the AIPLA 2001 rates (75th percentile for "Other Central," or $250 per hour for partners and $180 per hour for associates), the Burns Doane partner component of the fee award is $684,993.75, and

the Burns Doane associate component is $477,660.00.

### 18. *Legal Assistants*

■ Zenith argues that the court should also reduce the time billed for work by Burns Doane legal assistants and law clerks. One specific challenge is for 190 hours spent on a chart prepared by law clerk Reza Ghafoorian, M.D., identifying "promising yet abandoned compounds." Zenith argues that the chart never saw the light of day. The reason it did not see the light of day, however, is that it dealt with Lilly's invention of nizatidine, which Zenith tried to put at issue but as ·to which the court granted Lilly's motion *in limine.* The effort was reasonable, although the number of hours certainly seems high.

Burns Doane legal assistants and two partners also spent, by Zenith's estimate, about 120 hours on multiple trips to Indianapolis, primarily to pick the right hotel for trial headquarters. Zenith's estimate is inflated by also including the lawyers' time meeting with court personnel regarding trial logistics. Zenith still has a good point, though, and the court believes that the broader deduction for travel time and expenses effectively addresses these excessive efforts by the partners. The legal assistants' time on these tasks remains excessive.

Another example of wasted legal assistant work was preparation of an elaborate nine-color time line that Burns Doane used to justify its motion to continue the trial then scheduled for May 2001. The motion actually required a hearing and, because of an unusual issue involving timing under the Hatch–Waxman Act, a short explanation. See *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.,* 58 U.S.P.Q.2d 1543, 2001 WL 238090 (S.D.Ind.2001). The court granted Lilly's motion to continue. One memorable moment at the hearing came ·when Burns Doane proudly displayed the large poster-size version of the time line, which was intended to show that Zenith had been stalling. The poster-size version was a beautiful work of visual communication, except for the basic fact that it could not be read from the bench, or from any point more than three feet from the poster. It is not clear how much time and effort went into that visual display, but the effort and expense were certainly wasted and should not be billed to Zenith.

■ More generally, Zenith also questions substantial amounts of time for Burns Doane legal assistants spent shopping and coordinating travel arrangements and trial logistics, such as setting up the "war rooms." Zenith's criticisms are valid. It is clear that the Burns Doane records include a great deal of excessive time by legal assistants, including time devoted to clerical or other tasks for which even the $100 rate is not remotely justifiable. The reason that a legal assistant's time can be billed as part of an attorney fee in the first place is that the assistant does work that an attorney would otherwise have done, and does it at a lower hourly rate. See *Missouri v. Jenkins,* 491 U.S. 274, 287–88 & n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (explaining rationale and cautioning: "Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them."), citing *Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 846 (7th Cir.1984); *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 553 (7th Cir.1999) ("The relevant inquiry for requested paralegal fees is 'whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder.' Accordingly, the district court should disallow time spent on what are essentially 'clerical' or secretarial tasks. In this case, the tasks for which [plaintiff's] counsel sought an award of paralegal fees included organiz-

ing file folders, document preparation, and copying documents."), quoting *People Who Care v. Rockford Board of Education*, 90 F.3d 1307, 1315 (7th Cir.1996). Shopping, moving furniture, setting up computer systems, and similar tasks should not be compensated separately from the attorneys' hourly rates.

It is not practical to identify each excessive or unjustified time entry for the legal assistants. The lodestar amount of hours for law clerks and legal assistants was 4,971.73. The court applies a 30 percent reduction to that number, which is the court's best estimate of a fair adjustment for excessive and unreasonable hours, time spent on clerical and administrative tasks, and time required as a result of travel. The revised lodestar becomes 3,480.211 hours for law clerks and legal assistants. Multiplied by $100 per hour, their time adds up to $348,021.10.

### V. *Lilly's Inside Counsel*

 Lilly's fee petition seeks an award for work by Dr. Manisha A. Desai, an inside patent attorney employed by Lilly. During the latter stages of the case, Dr. Desai was the primary liaison between Lilly and Burns Doane. Dr. Desai kept relatively detailed time records regarding her efforts on this case. The petition seeks $45,526.69 for her time, not at market hourly rates but based on pro-rating her salary during the relevant times. The petition also seeks her travel expenses of about $8,600. The court denies this request in its entirety because Dr. Desai did not function as trial counsel.

In support of the request, Lilly cites *PPG Industries, Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d at 1565, 1570 (Fed.Cir.1988), which held that a fee award

for inside attorneys was justified where the inside attorneys had been acting as lead trial counsel. *Id.* at 1569 (request for fee for "services rendered by in-house counsel during the time period that they were lead litigation counsel"). For such front-line litigation work, a fee award is appropriate. *Scripps Clinic & Research Foundation v. Baxter Travenol Labs., Inc.*, 17 U.S.P.Q.2d 1046, 1047, 1990 WL 146385 (D.Del.1990) (fees for in-house counsel appropriate "only when counsel is performing legal work that would otherwise be performed by outside counsel"), citing *Procter & Gamble Co. v. Weyerhaeuser Co.*, 711 F.Supp. 904, 906–07 (N.D.Ill.1989).

Courts have recognized, however, that fee awards for inside counsel are not appropriate where outside counsel have handled the front-line litigation work. In fact, the district court in *PPG* drew precisely this distinction. *PPG Industries, Inc. v. Celanese Polymer Specialties Co.*, 658 F.Supp. 555, 562 (W.D.Ky.1987). The district court disallowed an award for the inside counsel's time spent as lead counsel only because of a lack of time records and other documentation. The Federal Circuit reversed that latter aspect of the decision but did not indicate any disagreement with the district court's decision to exclude all of the inside counsel's time for periods when outside counsel were also in the case. See 840 F.2d at 1569–70. Thus, in *PPG* the Federal Circuit was not inviting a new set of fee awards for inside counsel who act as liaison with outside counsel. Instead, the Federal Circuit was fashioning a reasonable fee award where the client had chosen to be represented by attorneys who were full-time employees rather than outside contractors.[8]

---

**8.** In *Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal, Inc.*, 51 F.Supp.2d 302, 307 (S.D.N.Y.1999), a similar case under the Hatch–Waxman Act involving a similar drug,

Judge Owen included fees for in-house counsel in a fee award. The court wrote that the allowed fee was for work that otherwise would have been done by outside counsel,

Lilly also cites *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 2002 WL 1801647 (S.D.Ind. July 5, 2002), in which this court awarded fees under Rule 37 of the Federal Rules of Civil Procedure and 35 U.S.C. § 285 for a portion of a patent case in which the lead expert witness for plaintiffs (which included Lilly) admitted having deliberately lied to conceal other expert witness work he had been doing that would have weakened the credibility of his trial testimony. In *Cardiac Pacemakers,* the court used a private firm market rate for an inside attorney's time. Two points distinguish this case from *Cardiac Pacemakers.*

First, the award for the inside attorney's time in *Cardiac Pacemakers* was only for his "front-line" litigation work on the expert witness issue. That work would have been done by an outside attorney if he had not done it. The fee award did not include time for his more general role of supervising the outside attorneys. In this case, however, Dr. Desai's role was the more traditional role of inside liaison counsel as opposed to front-line litigation work and therefore is not compensable under § 285.

Second, the court's decision in *Cardiac Pacemakers* was based on Seventh Circuit law. See *Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.,* 76 F.3d 114, 117 (7th Cir. 1996) (fee award based on work of in-house lawyers should be based on market hourly rate). The court was acting primarily under Rule 37, and those standards "are not

specific to patent law." 2002 WL 1801647, *3 at n. 2. In this case, however, the court is making the fee award only under 35 U.S.C. § 285. As noted above, the Federal Circuit has held that its law should apply to such fee awards. See *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,* 182 F.3d 1356, 1359 (Fed.Cir.1999).[9]

### VI. *Expert Witness Fees*

■ Lilly seeks reimbursement of $381,266.25 for its expert witness fees. As Lilly acknowledges in its brief, the Federal Circuit now holds that such expert witness fees may not be awarded only on the authority of the "exceptional case" provision of 35 U.S.C. § 285. *Amsted Industries Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 377 (Fed.Cir.1994), overruling *Mathis v. Spears,* 857 F.2d 749, 759 (Fed.Cir. 1988).

*Amsted Industries* left the door open for expert witness fee awards under the court's inherent authority if a case "goes sufficiently beyond 'exceptional' within the meaning of section 285 to justify an award of expert fees as a sanction under the court's inherent power." 23 F.3d at 379. Lilly argues that the court should go through that door and make such a finding in this case, but the court declines the invitation. The court explained previously why this is an exceptional case warranting an award of reasonable attorney fees and costs under § 285. All the matters argued by Lilly on this point were fully taken into account in the court's original decision,

---

which indicates that the award was for "front-line" litigation work rather than in-house counsel's supervision of outside counsel.

9. The court acknowledges the rather odd situation produced by this reasoning, in which a district court applies regional circuit law to fee awards for discovery motions and related sanctions, and Federal Circuit law to fee awards under 35 U.S.C. § 285. The result

seems especially odd when the award is based on both Rule 37 and § 285, as it was in *Cardiac Pacemakers.* Nevertheless, that seems to be the logical result under the Federal Circuit's decisions holding that its law applies to determine fee awards under § 285, but that regional circuit law applies to fee awards under Rule 37. *E.g., Pickholtz v. Rainbow Technologies, Inc.,* 284 F.3d 1365, 1371 (Fed.Cir.2002).

with one exception: Zenith's failure to meet "essential deadlines." That failure, however, would have hurt Zenith more than anyone else, at least if its obviousness defense had been viable. The court has not found the sort of fraud and abuse of the judicial process that *Amsted Industries* held would be required to exercise inherent power to award expert witness fees. Lilly's request for reimbursement of expert witness fees must be denied.

## VII. *Other Litigation Costs*

Lilly seeks reimbursement for a variety of other litigation expenses under both § 285 and 28 U.S.C. § 1920, which is the ordinary cost provision for prevailing parties in federal civil litigation.

### A. *Postage and Express Delivery*

■ Lilly seeks $30,155.06 for "express mail" charges (actually, private express couriers) and only $69.26 for ordinary postage, showing that overnight couriers were the preferred method of communication in this case. There was nothing urgent about matters in this case that would justify shifting the costs of overnight shipments to Zenith. The use of the express courier services might have been a convenience to lawyers who were cutting their deadlines closely, but there is no reason to justify shifting that cost to the opposing party beyond what was reasonably *necessary* for the case. In addition, one other problem with this claim is that Lilly's support for the express courier charges, set forth in Exhibit S, shows a total of only $12,733.04, less than half of the claimed $30,155.06.

Under these circumstances, the court is not going to calculate the amount of reasonable actual postage charges. The court will allow a total of $3,000 in postage expenses for the case, which is a generous estimate of the amount that can fairly be shifted to Zenith.

### B. *Facsimile Charges*

■ The fee petition claims in Exhibit GG that accounting records for Burns Doane show facsimile costs of $8,917.02. There is no specification of what was sent or why the facsimiles were sent. Many of the transmittals were between Burns Doane and Lilly, expenses caused only by Lilly's selection of distant counsel, and the reasoning applicable to express courier charges also applies to facsimile charges. The court will allow $1,000 in facsimile charges.

### C. *Photocopying*

■ Lilly has separated its photocopying request into three parts:

| | |
|---|---|
| Lead Litigation | $141,292.70 |
| Local Counsel | $ 591.60 |
| In House Counsel | $ 9,594.31 |

The Lead Litigation copying expenses are divided into two parts:

| | |
|---|---|
| Exhibit Q1 | Burns Doane Accounting |
| Exhibit Q2 | Burns Doane Outside |

The Burns Doane Accounting records (Exhibit Q1) list a total amount of $77,164.55, but there is no total listed for the outside vendors. This is especially significant because the petition includes duplicate bills. The October 18, 2000 bill is included four times. The November 3, 2000 bill of $2,529.16 is included four times. The November 3, 2000 bill of $2,424.44 is included five times, plus there is a letter from Burns Doane telling Zenith's counsel to pay this bill directly. The August 20, 2001 bill is included twice.

With this sort of mess in the records submitted, the court is not going to take its own time in an effort to determine if all of the copying expenses being claimed are supported. This case would have required Burns Doane to do substantial copying under any circumstances, such as copying

more than 50,000 pages produced in discovery and making necessary copies of pleadings and other court filings. The court will allow $25,000 in total copying charges for Burns Doane.

### D. *Electronic Research*

██ Lilly seeks reimbursement for $24,286.24 for electronic research by Burns Doane. Exhibit Z summarizes the charges but provides no description of what was researched or why, unless someone wanted to compare approximately 300 entries with attorneys' diary entries for the same day. Nevertheless, Exhibit Z lists charges of $35,253.29, while Lilly is seeking only $24,286.24. This figure thus appears already to reflect a substantial discount and appears to be reasonable overall. The court will allow the requested $24,286.24.

### E. *Telephone Expenses*

██ Exhibit R, Burns Doane's accounting records, lists telephone expenses of $4,155.76, but Lilly apparently is seeking only $2,508.46. Most of these charges resulted from Lilly's decision to hire distant counsel, but some long-distance charges would certainly have been incurred in any event in dealing with Zenith's lawyers, distant expert witnesses, and the like. The court will allow $1,000 for telephone charges.

### F. *Court Reporters*

██ Lilly seeks to recover $37,315.23 for the costs of 22 depositions and transcripts of court proceedings. The costs of deposition transcripts are allowed on the expectation that the depositions were reasonably taken for use in the proceeding. This rationale contemplates the use of the actual transcripts. To the extent that costs of deposition transcripts are to be allowed, the costs should be limited to the reasonable per page cost. The costs of numerous extra services such as "Live Note Hookup," expedited delivery, rough

drafts, ASCII discs, Real Time, E Transcript "Rough Copy," and the costs of extra copies of exhibits cannot fairly be shifted to Zenith.

The cost per page varied from a base of $2.75 per page to $6.25 per page. This is higher than this court normally allows. In addition to the per page charges, there were appearance fees ranging from $65.00 to $170.00. An example of these extra charges can be found in the invoice for the deposition of Scott White taken on October 27, 2000. The deposition was 96 pages in length. The charges were:

| | |
|---|---:|
| 96 pages @ $3.75 per page | $ 360.00 |
| Appearance fee | $ 90.00 |
| Hookup fee | $ 65.00 |
| ASCII | $ 10.00 |
| Exhibits 47@ $.50 | $ 23.50 |
| Real time 96 @ $3.75 per page | $ 360.00 |
| Shipping | $ 20.00 |
| Video charge | $ 455.00 |
| Master tape 2 @ $10.00 | $ 20.00 |
| VHS copies 2 @ $10.00 | $ 20.00 |
| Shipping | $ 20.00 |
| | $1,443.50 |

This adds up to an effective rate of an unreasonably high $15 per page.

██ The reimbursement for video depositions is another issue. Lilly seeks reimbursement for 9 video depositions (including the White deposition). The cost of video depositions adds significantly to the cost of the depositions and cannot be supported as a cost in this bench trial. The cost of duplicate tapes (Mittleberg—2 duplicate tapes; Rutkowski—3 duplicate tapes; Krumholz—3 duplicate tapes; Steth—2 duplicate tapes; Teschner—3 duplicate tapes) also cannot be fairly shifted to Zenith.

The court's best estimate is that half of the claimed amount for depositions should be allowed to cover the transcripts and one set of exhibits, without all of the extra charges, including the videotape charges. The court will award court reporter fees of $21,289.00, which allows the full amount

for court proceedings and half the amount claimed for depositions.

### G. *Travel Costs*

■ The Lilly petition seeks a total of $204,059.95 in travel expenses. The court discussed above some of the problems with the actual travel expenses submitted by Burns Doane. Even if Lilly had chosen to use lawyers who would not have had to travel to Indianapolis, however, some travel expenses would have been incurred to take depositions, to work with expert witnesses, and to bring witnesses to trial. The court will include $20,000 for travel expenses in the fee award, which is the court's estimate of expenses that would have been incurred if lead counsel had been located where the court selected by plaintiff Lilly is located.

### H. *Exemplification Costs*

■ Lilly seeks $136,653.12 for "Exemplification Costs," with support found in Exhibit Y, which contains the following invoices:

| | | |
|---|---|---|
| 3/23/01 | Prepare courtroom exhibits | $14,459.55 |
| 10/4/01 | Equipment rental court-<br>room/war room | $14,263.52 |
| 9/28/01 | Prepare courtroom exhibits | $56,464.68 |
| 9/28/01 | Trial consulting | $33,465.83 |
| 9/27/01 | Video tape conversion | $15,242.54 |
| 9/27/01 | Document Imaging | $ 1,572.00 |
| 9/28/01 | Software Purchase | $ 1,185.00 |

Such costs have been the subject of controversy among federal courts. The Federal Circuit has held that such costs should be governed by the regional circuit's law. Compare *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 428–29 (7th Cir.2000) (allowing costs of computerized simulations under section 1920 where reasonably necessary for case), with *Kohus v. Toys "R" Us, Inc.*, 282 F.3d 1355, 1359–60 (Fed.Cir.2002) (applying Sixth Circuit law concerning demonstrative evidence and holding that video model of invention's operation was not taxable as exemplification cost under section 1920 because video was "a substitute for a physical model and was created as an aid to the argument of counsel"). Even under the expansive Seventh Circuit approach to such costs, however, the court must consider whether the exemplification was "vital to the presentation of the information, or was it merely a convenience or worse, an extravagance?" 211 F.3d at 428–29. The Seventh Circuit warned against the danger of extravagant displays to dazzle the court and jury: "the use of a multi-media presentation may have less to do with conveying information to a judge and jury than it does with an effort to wow them. No doubt the statute does not obligate the losing party to pay for the victor's 'glitz'...." *Id.* at 428. Even under the Seventh Circuit approach, it is hard to see how "trial consulting" (which makes up a large fraction of the "exemplification" costs sought by Lilly) could fall within § 1920, for a lawyer's time spent designing demonstrative exhibits is not compensable under § 1920.

Several observations are in order here. First, the subject matter of this trial—the synthesis of organic chemical compounds to treat human diseases—led the court to welcome educational efforts. Visual aids such as diagrams and models of compounds and portions of compounds were very helpful to the court. However, this was a bench trial. What the court needed were paper copies of diagrams and illustrations, not elaborate computer simulations or computerized versions of paper drawings. Also, to the extent the parties wished to use electronic displays of evidence, the court had sufficient equipment available. Lilly chose to bring in its own equipment. It had the right to do so, but that decision cannot fairly be billed to Zenith, as Lilly seeks to do with its bills for courtroom and "war room" equipment. In sum, Lilly seeks exemplification costs well in excess of any reasonable figure for this case. The court will allow a total of $5,000 for exemplification costs.

## VIII. *Prejudgment Interest*

Lilly seeks prejudgment interest on the amount of fees awarded to compensate it for the delay in payment. Fee awards may take into account the delay in payment of fees for work often performed several years earlier. *Mathis v. Spears,* 857 F.2d 749, 761 (Fed.Cir.1988). Under § 285, the court exercises equitable discretion to determine whether to award prejudgment interest and, if so, in deciding how to calculate the award. *Id.* The adjustment for delay can be made in different ways, such as by setting an appropriate rate of interest and working out the appropriate interest for each segment of the attorney's work, or by paying the attorney's current hourly rate for work done throughout the case. *E.g., Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation" of 42 U.S.C. § 1988); *Smith v. Village of Maywood,* 17 F.3d 219, 221 (7th Cir.1994) (court may make adjustments for delay by using current hourly rates or past rates with interest); *Lightfoot v. Walker,* 826 F.2d 516, 523 (7th Cir.1987) ("To compensate for the delay in payment and to simplify its calculation, courts often calculate fee awards using current market rates as opposed to historic rates.").

■ The fees and expenses in this case were incurred from December 1998 through October 2001. The court deals separately with two elements of delay. The first element is delay through the time the fee petition was submitted. The court is applying the 2001 AIPLA survey rates (75th percentile for "Other Central") to the work done by Burns Doane lawyers in 1998, 1999, and 2000, as well as 2001. Using the methodology the Seventh Circuit has approved in *Smith, Lightfoot,* and many other cases, that adjustment accounts for those delays through the time the fee petition was submitted.

■ The second element is the time the fee petition has been pending, which has been unusually long. After reviewing the petition in detail, however, the court finds that Lilly itself is primarily responsible for the long delay. The requests for Burns Doane fees and for costs were so exorbitant and unreasonable that Zenith had to take a considerable amount of time to review and challenge them and to conduct discovery, and the court had to take considerable time to analyze the resulting disputes.

The problem is illustrated nicely by both the beginning of the case and the end of the case, at least on the merits. The very first time entry charged to the case in the vast billing files of Burns Doane appears to be for a consultation about the drug Prozac, which has nothing to do with this case. See Ex. G (12/4/98 entry for Ronald Grudziecki: "telephone conference with J. Burns regarding Prozac matter; discuss with BOS").[10]

At the end of the case, after the court issued its findings of fact and conclusions of law in favor of Lilly, the Burns Doane litigation team went to an Alexandria, Virginia restaurant for a dinner. The cost was $1,197.55. That charge is included in the Lilly petition for fees and expenses. See Ex. P. The charge obviously is not for a travel expense, for the restaurant is close to Burns Doane's offices and there was no reason for anyone to be traveling.

10. At page 11 of its reply brief, Lilly asserted the entry was really for Axid. Either way, the billing entry was obviously wrong and was never corrected. The court is more troubled by the failure to notice the error either when the bill was sent or when the fee petition was submitted than by the unremarkable fact that an error was made in the original entry.

Only seven Burns Doane timekeepers billed time to the case on October 15, 2001. Five referred to a one-hour "team meeting" that one described as "to discuss decision." Ex. J. With so few timekeepers billing time to the case that day, the restaurant bill has every appearance of being the bill for a victory celebration. There is no other explanation apparent from the daily time records. It is not unreasonable, of course, for lawyers who have worked hard and won a significant victory to want to celebrate. Perhaps the pleased client was even happy to pay for the celebration. But an effort to charge the losing party the cost of the celebration would be extraordinary. Moreover, even if the dinner was not a victory celebration but was instead a needed "team meeting to discuss decision" from the billing records, there would still be no legitimate basis for shifting the expense of the meal to Zenith.[11]

These claims for fees and expenses are symptomatic of the entire petition. When, among many other problems, the very first time entry obviously was not scrutinized by any lawyer responsible for submitting the fee petition, and when the prevailing party tried to make the loser pay for what certainly looks like its victory celebration (and which would not be reimbursable even if it was not a celebration), the party submitting the petition has sacrificed any claim to equity or to the benefits of reasonable doubts about the petition.

As discussed above in Part II, the court has considered whether it should just deny the fee petition in its entirety. Parties and attorneys need to be discouraged from submitting unreasonable requests in the hope that the opponent and/or the court will simply be unable or unwilling to find all the unreasonable and improper charges. Those courts that have denied in their entirety such grossly excessive fee petitions have reasoned that strong disincentives must be in place to discourage such fee petitions. See *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir.1980), quoted in *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 558 (5th Cir. 1998); accord, *Lewis v. Kendrick*, 944 F.2d 949, 958 (1st Cir.1991). An approach less punitive than complete denial should be sufficient in this case. One appropriate response that fits the wrong is to deny prejudgment interest for the period of unusual delay while the excessive fee petition was pending. For these reasons, the court exercises its discretion to take that approach here and applies the 2001 AIPLA survey rates, without prejudgment interest. From the entry of judgment, of course, post-judgment interest will be available on the amounts actually awarded.

IX. *Fees for the Fee Petition*

Fees incurred in preparing a fee petition ordinarily should be awarded as part of the work on a case. The parties have not directed the court's attention to Federal Circuit decisions addressing the point directly, see *Mathis v. Spears*, 857 F.2d at 756 (under § 285, affirming such

---

11. The Lilly/Burns Doane bill also includes other questionable dinner expenses. On August 28, 2001, the Burns Doane team had dinner at the same Alexandria restaurant just before the team traveled to Indianapolis. The bill was $475.00 and it obviously was not a travel expense.

For the evening of September 13, 2001, after counsel had presented closing arguments, the "trial team" in Indianapolis had a buffet dinner for 22 at their hotel at a charge of $1,231.18, Ex. P3, but also charged $1,614.82 for a dinner at an Indianapolis restaurant, as well as a hotel bar bill of $130.50, Ex. P1. Everyone had to eat, of course, and travel was thoroughly delayed and disrupted after September 11th. Still, it is difficult to understand how *all* of these charges could fairly be shifted to Zenith even if the trial team's travel expenses were being allowed.

an award with minimal discussion), but such awards are routine in civil rights and other fee-shifting cases. See, *e.g., Kurowski v. Krajewski,* 848 F.2d 767, 777 (7th Cir.1988) (in civil rights action, counsel are entitled to full compensation, including the time spent pursuing requests for fees), citing *Muscare v. Quinn,* 680 F.2d 42 (7th Cir.1982).

In this case, however, such fees for work on the fee petition are not justified. Much of the time was spent on attempts to justify excessive and unreasonable fees and expenses. The result of those efforts was to multiply work for Zenith and for the court, dealing with matters that never should have been submitted to the court at all. Under these circumstances, the court has the discretion, and exercises it here, to deny entirely any fees incurred in preparing the extravagant fee and cost petition. See *Muscare v. Quinn,* 680 F.2d at 45 (district judge had discretion to deny the plaintiff's second fee request for preparing fees in its entirety: "If the fee claims are exorbitant or the time devoted to presenting them is unnecessarily high, the judge may refuse further compensation ...."), quoting *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), and citing *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978) ("if the attorney's initial claims are exorbitant, or the time spent advancing them unreasonable, the district court should refuse the further compensation"); see also *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983) (reversing district court's award of 322 hours in fees for preparing fee petition where plaintiffs' attorneys' failure to keep contemporaneous time records caused extra effort for both plaintiffs' attorneys and defense counsel). Thus, for essentially the same reasons discussed regarding prejudgment interest, the court also denies Lilly's request for fees incurred in preparing this exorbitant and unreliable fee and cost petition.

## Conclusion

The reasonable and allowable fees and costs are summarized below:

### Attorney Fees

| | |
|---|---|
| Barnes & Thornburg | $ 12,900.00 |
| Burns Doane Partners | $ 684,993.75 |
| Burns Doane Associates | $ 477,666.00 |
| Burns Doane Law Clerks/ Legal Assistants | $ 348,021.10 |
| Total Fees | $1,523,580.85 |

### Expenses

| | |
|---|---|
| Postage | $ 3,000.00 |
| Fax | $ 1,000.00 |
| Copying | $ 25,000.00 |
| Electronic Research | $ 24,286.24 |
| Telephone | $ 1,000.00 |
| Court Reporters | $ 21,289.00 |
| Travel | $ 20,000.00 |
| Exemplification | $ 5,000.00 |
| Barnes & Thornburg Expenses | $ 1,001.10 |
| Total Costs | $ 101,576.34 |

Accordingly, pursuant to 35 U.S.C. § 285, the court awards plaintiff Lilly total attorney fees of $1,523,580.85. Pursuant to 35 U.S.C. § 285 and 28 U.S.C. § 1920, the court awards Lilly total costs of $101,576.34, for a total award of $1,625,157.19. The court is entering final judgment with declaratory relief and the fee and cost award.

So ordered.